UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FT. LAUDERDALE DIVISION

IN RE:

GULFSTREAM CRANE, LLC,

        Debtor.

Case No.: 09-37091-BKC-RBR

Chapter 11

_____ /

## NOTICE OF FILING EXHIBIT "D" TO FIRST AMENDED DISCLOSURE STATEMENT FOR DEBTOR'S FIRST AMENDED PLAN OF LIQUIDATION

      GULFSTREAM CRANE, LLC, the Debtor and Debtor-in-Possession in the above-styled

Chapter 11 proceedings, by and through undersigned counsel, hereby files Exhibit "D" to the

*First Amended Disclosure Statement for Debtor's First Amended Plan of Liquidation* (D.E. #

586) - the "Asset Purchase Agreement by and between Gulfstream Crane, LLC, as Seller, and

Allegiance Crane & Equipment, LLC, as Purchaser" – a copy of which is attached hereto.[1]

                         s/Michael D. Seese
                         Michael D. Seese (FBN 997323)
                         HINSHAW & CULBERTSON LLP
                         One East Broward Boulevard
                         Suite 1010
                         Ft. Lauderdale, FL 33301
                         Telephone:  954-467-7900
                         Facsimile:  954-467-1024

---

[1] The parties reserve the right to amend or modify the Asset Purchase Agreement, including, without limitation, any Exhibits and Schedules.

# ASSET PURCHASE AGREEMENT

**by and between**

**Gulfstream Crane, LLC,**
**as Seller,**

**and**

**Allegiance Crane & Equipment, LLC,**
**as Purchaser**

**Dated as of November __, 2010**

## TABLE OF CONTENTS

1. Transfer of Assets. ................................................................................................. 1
   1.1 Purchase and Sale of Assets ........................................................................ 1
   1.2 Excluded Assets. .......................................................................................... 3
   1.3 Instruments of Transfer. ............................................................................... 3
2. Consideration for Saleable Assets. ...................................................................... 3
   2.1 Purchase Price. ............................................................................................. 3
   2.2 Deposit. ........................................................................................................ 3
   2.3 Payment of Purchase Price ........................................................................... 4
   2.4 Assumed Liabilities. ..................................................................................... 4
   2.5 Excluded Liabilities. ..................................................................................... 4
   2.6 Purchase Price Allocation. ........................................................................... 5
3. Closing. ................................................................................................................. 5
   3.1 Closing Conference. ...................................................................................... 5
   3.2 Closing Date. ................................................................................................ 5
   3.3 Seller's Deliveries to Purchaser at Closing. ................................................ 6
   3.4 Purchaser's Deliveries to Seller at Closing. ................................................ 7
   3.5 Transferred Employees. ................................................................................ 7
   3.6 Taxes. ........................................................................................................... 9
   3.7 Possession. ................................................................................................... 9
4. Conditions Precedent to Closing. ........................................................................ 10
   4.1 Conditions to Seller's Obligations. .............................................................. 10
   4.2 Conditions to Purchaser's Obligations. ........................................................ 11
   4.3 Grounds for Termination .............................................................................. 12
   4.4 Manner and Effect of Termination. ............................................................... 13
5. Seller's Representations and Warranties. ............................................................. 13
   5.1 Due Organization. ......................................................................................... 13
   5.2 Power and Authority. .................................................................................... 13
   5.3 Authorization and Validity of Agreement. ................................................... 14
   5.4 No Conflicts. ................................................................................................. 14
   5.5 Title. .............................................................................................................. 14
   5.6 Compliance with Laws. ................................................................................ 14
   5.7 Litigation. ..................................................................................................... 15
   5.8 Financial Information; Absence of Changes and Undisclosed Liabilities. ... 15
   5.9 Business Employees. ..................................................................................... 16
   5.10 Employee Benefit Plans. ............................................................................... 16
   5.11 Labor Matters. ............................................................................................... 17
   5.12 Taxes. ........................................................................................................... 17
   5.13 Contracts. ...................................................................................................... 18
   5.14 Real Property ................................................................................................. 19
   5.15 Environmental Matters. ................................................................................ 19
   5.16 Intellectual Property. .................................................................................... 20
   5.17 Insurance. ..................................................................................................... 20
   5.18 Full Disclosure. ............................................................................................ 20
   5.19 Bankruptcy Schedules. ................................................................................. 20
6. Purchaser's Representations and Warranties. ...................................................... 21

| | | |
|---|---|---|
| 6.1 | Due Organization. | 21 |
| 6.2 | Power and Authority. | 21 |
| 6.3 | Authorization and Validity of Agreement. | 21 |
| 6.4 | No Conflicts. | 21 |
| 7. | Other Agreements of the Parties. | 21 |
| 7.1 | Access to Business Information of Seller. | 21 |
| 7.2 | Conduct of Business Before Closing. | 22 |
| 7.3 | Bankruptcy Court Approvals. | 24 |
| 7.4 | Executory Contracts. | 24 |
| 7.5 | Certain Notices. | 24 |
| 7.6 | Reasonable Commercial Efforts. | 24 |
| 7.7 | Access to Information and Other Post-Closing Cooperation. | 25 |
| 7.8 | Brokerage Obligations. | 25 |
| 7.9 | Cash and Cash Equivalents. | 26 |
| 7.10 | Update of Disclosure Schedules. | 26 |
| 7.11 | Cooperation. | 26 |
| 8. | Definitions. | 27 |
| 8.1 | Terms Defined Elsewhere in this Agreement. | 33 |
| 9. | Miscellaneous. | 35 |
| 9.1 | Expenses. | 35 |
| 9.2 | Liability of Seller's Agents. | 35 |
| 9.3 | Attorneys' Fees. | 35 |
| 9.4 | Notices. | 35 |
| 9.5 | Entire Agreement. | 36 |
| 9.6 | Amendment. | 36 |
| 9.7 | Assignments. | 36 |
| 9.8 | Binding Effect. | 37 |
| 9.9 | Severability. | 37 |
| 9.10 | Waiver. | 37 |
| 9.11 | Consent to Jurisdiction. | 37 |
| 9.12 | Conflicts with Plan of Liquidation/Confirmation Order. | 38 |
| 9.13 | Interpretation. | 38 |
| 9.14 | Counterparts. | 39 |
| 9.15 | Time is of the Essence. | 39 |
| 9.16 | Third Party Beneficiaries. | 39 |
| 9.17 | Tax Effect. | 39 |
| 9.18 | Investigation. | 39 |
| 9.19 | Limitation of Representations and Warranties. | 39 |

## INDEX OF EXHIBITS AND SCHEDULES

<u>Exhibits</u>

| | |
|---|---|
| Exhibit A | Form Assignment and Assumption Agreement |
| Exhibit B | Form Bill of Sale |
| Exhibit C | Form Assignment of Intangible Property |
| Exhibit D | Form Master Loan and Security Agreements |

<u>Schedules</u>

| | |
|---|---|
| Schedule 1.1.1 | Tangible Personal Property |
| Schedule 1.1.1a | Tangible Personal Property – Equipment and Operating Assets |
| Schedule 1.1.3 | Intangible Property |
| Schedule 1.1.4-1 | Personal Property Leases |
| Schedule 1.1.4-2 | Business Contracts |
| Schedule 1.2 | Excluded Assets |
| Schedule 2.4 | Assumed Liabilities |
| Schedule 5.5 | Title to Saleable Assets |
| Schedule 5.6.2 | Permits |
| Schedule 5.8.3 | Aged Receivables Report |
| Schedule 5.10.1 | Employee Benefit Plans |
| Schedule 5.10.4 | Healthcare Continuation Coverage |
| Schedule 5.12.5 | Foreign and Domestic Tax Jurisdictions |
| Schedule 5.13.1 | Material Contracts |
| Schedule 5.15 | Environmental Matters |
| Schedule 5.17 | Insurance |

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "*Agreement*") is made and entered into as of the ___ day of November, 2010 (the "*Execution Date*"), by and between Gulfstream Crane, LLC, a Florida limited liability company d/b/a General Crane USA ("*Seller*"), and Allegiance Crane & Equipment, LLC, a Delaware limited liability company ("*Purchaser*"). Capitalized terms used in this Agreement that are not otherwise defined herein shall have the meanings ascribed to such terms in Section 8 below.

## RECITALS

A. On December 8, 2009 (the "*Petition Date*"), Seller filed a voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of Florida (the "*Bankruptcy Court*"), the case being administered as Case No. 09-37091-RBR (the "*Case*").

B. Seller, having its principal executive offices in Pompano Beach, Florida, is engaged in the Business.

C. On July 7, 2010, Seller filed its Debtor's Plan of Liquidation (the "*Original Plan of Liquidation*") and on October 12, 2010, Seller filed its First Amended Plan of Liquidation (the "*Amended Plan*," as may be further amended, "*The Plan of Liquidation*"). On October 12, 2010, Seller filed its First Amended Disclosure Statement for the Plan of Liquidation.

D. Seller has determined that a significant component of the Plan of Liquidation is the prompt disposition of the Saleable Assets (as hereinafter defined) in order to preserve the value inherent in the Saleable Assets for the benefit of its creditors.

E. Upon the terms and subject to the conditions set forth herein and pursuant to Sections 363, 365, and 1129 of the Bankruptcy Code, Seller desires to sell, transfer, convey, assign and deliver to Purchaser, and Purchaser desires to purchase and accept from Seller, the Saleable Assets as contemplated herein.

F. The parties hereto desire to consummate the Contemplated Transactions (as hereinafter defined) as promptly as practicable after the commencement of the Case and after the Bankruptcy Court enters an order confirming the Plan of Liquidation and approving the Contemplated Transactions (the "*Confirmation Order*").

NOW, THEREFORE, in consideration of the foregoing and of the representations, warranties, covenants and agreements made herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

1. Transfer of Assets.

1.1     Purchase and Sale of Assets.  Upon the terms and subject to the conditions of this Agreement, on the Closing Date (as defined below), Seller shall sell, assign, transfer, convey and deliver to Purchaser, free and clear of all Liabilities (other than Assumed Liabilities) and Liens, and Purchaser shall purchase, acquire and accept from Seller, all of Seller's right, title and interest in and to all of Seller's tangible and intangible rights, properties and assets of every nature, kind and description, used or held for use by Seller in connection with the Business or necessary for the continuation of the Business as currently conducted, wherever located, whether arising by Contract, Law or otherwise, and whether or not carried or reflected on the books and records of Seller, including such rights, properties and assets hereafter acquired by Seller, all as the same are constituted as of the Closing Date, except for any assets that constitute part of the Excluded Assets (such assets, other than any of the Excluded Assets, the "*Saleable Assets*"). Without limiting the generality of the foregoing and except for any assets that constitute Excluded Assets, the Saleable Assets shall include the following:

1.1.1     Tangible Personal Property.  The Tangible Personal Property, a list of which is set forth on Schedule 1.1.1 and Schedule 1.1.1a as of the Closing Date, including, without limitation, the following assets currently stored at Hunter Crane's facility located at 2189 W. Atlantic Avenue, Delray Beach, Florida 33445: seventeen (17) Linden mm40 tower sections with clamps; fourteen (14) Linden mm50 tower sections with clamps; four (4) Comedil tower sections; and one (1) D34 to MM60 transition section with clamps.

1.1.2     Titles to Cranes and Rolling Stock.  Titles and licenses to any cranes, vehicles, trailers, crawlers, all terrain hydraulics and other rolling stock owned by Seller and included in the Saleable Assets, duly endorsed and notarized by Seller.

1.1.3     Intangible Property.  The Intangible Property, including but not limited to the Intellectual Property described on Schedule 1.1.3.

1.1.4     Leases and Contracts.  Seller's right, title and interest (i) as lessee under those Personal Property Leases described on Schedule 1.1.4-1, (the  "*Leases*"), and (ii) as a party to those other Contracts described on Schedule 1.1.4-2 (collectively, the "*Business Contracts*," and together with the Leases, the "*Leases and Contracts*") in each case, as and to the extent designated by Purchaser in accordance with Section 7.3.1 below as a Section 365 Contract and assigned to Purchaser at the Closing.

1.1.5     Accounts Receivable.  Any accounts receivable, notes receivable, deposits of Seller with third parties and refunds related to the Business as of the Closing Date in accordance with the Plan of Liquidation (the "*Receivables*").

1.1.6     Acquired Rights of Action.  All Rights of Action related to the collection of the Receivables or warranty claims with respect to the Saleable Assets (the "*Acquired Rights of Action*").

1.1.7     Inventory.  The Inventory as of the Closing Date.

1.1.8     Business Records.  The Business Records.

1.1.9  <u>Insurance Proceeds</u>.  All insurance proceeds related to the Saleable Assets or the Assumed Liabilities.

1.1.10  <u>Prepaid Items</u>.  All Business Prepaid Items.

1.1.11  <u>Goodwill</u>.  All goodwill of the Business.

1.2  <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained herein, including in <u>Section 1.1</u> above, Seller shall retain all of its right, title and interest in and to, and shall not transfer to the Purchaser, the Excluded Assets.

1.3  <u>Instruments of Transfer</u>.  The sale, assignment, transfer, and conveyance of the Saleable Assets to Purchaser shall be made by assignments, bills of sale, and other instruments of assignment, transfer and conveyance provided for in <u>Section 3</u> below and such other instruments as may reasonably be requested by Purchaser to transfer, convey, and assign the Saleable Assets to Purchaser.

2.  <u>Consideration for Saleable Assets</u>.

2.1  <u>Purchase Price</u>.  Upon the terms and subject to the conditions contained in this Agreement, as consideration for the purchase of the Saleable Assets contemplated herein, Purchaser shall assume the Assumed Liabilities in accordance with <u>Section 2.4</u> and shall, in each case as described in <u>Section 2.3</u> below, (i) pay on the Closing Date to Bank Midwest N.A. on behalf of Seller in accordance with the terms of the Plan of Liquidation, an aggregate amount equal to the sum of $14,360,000, such amount to be adjusted up or down on a dollar-for-dollar basis by the amount by which Seller's net accounts receivable at Closing are higher or lower than $2,937,000 as provided in the Plan of Liquidation, (ii) pay on the Closing Date an aggregate amount equal to the sum of $18,640,000 to SL Financial Services Corporation on behalf of Seller in accordance with the terms of the Plan of Liquidation; (iii) pay on the Closing Date an aggregate amount equal to the sum of $6,400,000 to Wells Fargo Equipment Finance Inc. in accordance with the terms of the Plan of Liquidation; and (iv) pay an amount up to $350,000, if and to the extent (a) the total Administrative Expenses and Cure Amounts (including $25,000 payable to the Administrator of the Plan of Liquidation), exceeds (b) the amount of Seller's cash balances on hand as of the Closing Date, for an aggregate purchase price of $39,750,000, subject to adjustment as described above (the "**Purchase Price**").  For the sake of clarity, Debtor shall pay all Administrative Expenses and Cure Amounts from Debtor's cash balances on hand as of the Closing Date and, if the amount of such cash balances are insufficient to pay all Administrative Expenses and Cure Amounts, then Purchaser shall pay the balance of the Administrative Expenses and Cure Amounts up to $350,000.  If Debtor's cash balances on hand as of the Closing Date are sufficient to pay (or reserve payment for) all Administrative Expenses and Cure Amounts, Purchaser shall have no obligation pursuant to clause (iv) of the first sentence of this Section 2.1 above.

2.2  <u>Deposit</u>.  Purchaser shall deposit, within one (1) Business Day after the execution of this Agreement, an amount in cash equal to $500,000 (the "Deposit") to be held in escrow by the Escrow Agent in an interest bearing account in accordance with the terms and provisions of the Escrow Agreement.  The fees and expenses of the Escrow Agent shall be paid

by Purchaser. Subject to the terms of this Agreement, upon the Closing of the transactions contemplated under this Agreement, the Deposit, plus the earned interest and any investment income, shall be paid to Purchaser in accordance with the terms of the Escrow Agreement to be applied towards the payment of the Cash Closing Payments.

2.3    Payment of Purchase Price. At the Closing, Purchaser shall (i) deliver, or cause to be delivered, payment of Cash Closing Payments to Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc. on behalf of Seller in accordance with the terms of the Plan of Liquidation in an aggregate amount equal to the Cash Closing Payments minus the amount of Tax allocable to Seller pursuant to Section 3.6.2; and (ii) deliver the Master Loan and Security Agreements to each of Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc. The Cash Closing Payments shall be made to Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc. by wire transfers of immediately available funds to the accounts specified by each of Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc., respectively.

2.4    Assumed Liabilities. On the Closing Date, Purchaser shall assume only the Assumed Liabilities.

2.5    Excluded Liabilities. Except for the specific Assumed Liabilities, Purchaser shall not assume or be liable for or bound by any Liability of Seller or any Lien, including, without limitation, any duties, responsibilities, liabilities, assessments, penalties or obligations of any kind or nature, whether known or unknown, whether asserted or unasserted, whether accrued or unaccrued, whether contingent, at law or in equity or otherwise, including any Liability based on successor liability theories (collectively, the "*Excluded Liabilities*"), including, without limitation, the following specific Excluded Liabilities:

2.5.1    all Liabilities, except Assumed Liabilities, of every kind whether or not asserted, scheduled or evidenced by a filed proof of claim or other form of writing evidencing such claim filed in the Case, secured, priority, administrative or unsecured, in each case, accrued prior to, on or after the Petition Date;

2.5.2    all Liabilities of Seller under the Section 365 Contracts accruing prior to the Closing Date;

2.5.3    all Liabilities of Seller under any Retained Contracts whether accruing prior to, at or after the Closing Date;

2.5.4    any and all Liabilities for Taxes arising from or with respect to the Saleable Assets or related to the Business that are included in or attributable to the operation of the Business on or before the Closing Date or the sale of the Business to Purchaser (including all Transfer Taxes which shall be waived and released under the Plan of Liquidation or paid by Seller pursuant to Section 3.6.1);

2.5.5    any Liabilities under the WARN Act arising solely as a result of the Contemplated Transactions;

2.5.6    any severance obligations to employees (by contract or otherwise) arising by reason of Purchaser's failure or refusal to offer employment to such employee on terms which, if accepted, would not give rise to severance obligations to such employee; and

2.5.7    all Liabilities of Seller for post-petition accrued wages and payroll Taxes of Seller as of the Closing Date with respect to Transferred Employees.

2.6    <u>Purchase Price Allocation</u>.  Seller and Purchaser recognize their mutual obligations pursuant to Section 1060 of the Code to timely file IRS Form 8594 with their respective federal income Tax Returns.  Within sixty (60) days after Closing, Purchaser shall submit to Seller in writing a proposed allocation of the Purchase Price (including the Assumed Liabilities, to the extent properly taken into account) among the Saleable Assets consistent with the provisions of Section 1060 of the Code and the Treasury Regulations thereunder and this Section 2.6 for Seller's review and comment.  If Seller and Purchaser agree on a final allocation, it shall be conclusive and binding upon Purchaser and Seller for all purposes, including Transfer Taxes, and the parties agree that all Tax Returns and all financial statements shall be prepared in a manner consistent with such allocation, and neither Seller nor Purchaser shall take a Tax position that is inconsistent with such allocation, unless required by the IRS or any other applicable taxing authority.

3.    <u>Closing</u>.

3.1    <u>Closing Conference</u>.  The closing of the purchase and sale of the Saleable Assets under this Agreement (the "Closing") shall take place at the offices of Hinshaw & Culbertson, LLP, One East Broward Blvd., Suite 1010, Ft. Lauderdale, FL 33301-1804.

3.2    <u>Closing Date</u>.

3.2.1    The Closing shall be held no later than the third (3rd) Business Day following the satisfaction or waiver of all conditions precedent to the parties' obligations hereunder (the "***Closing Date***"), or on such other date as may be mutually agreed upon by the parties hereto.

3.2.2    All actions to be taken on the Closing Date pursuant to this Agreement shall be deemed to have occurred simultaneously, and no act, document or transaction shall be deemed to have been taken, delivered or effected until all such actions, documents and transactions have been taken, delivered or effected.

3.3    <u>Seller's Deliveries to Purchaser at Closing</u>.  On the Closing Date, Seller shall make the following deliveries to Purchaser:

3.3.1    A counterpart of an Assignment and Assumption Agreement, substantially in the form attached as <u>Exhibit A</u> hereto, duly executed by Seller, pursuant to which (i) Seller assigns to Purchaser the Leases and Contracts designated by Purchaser on or prior to the Closing Date as Section 365 Contracts and (ii) Purchaser assumes the Assumed Liabilities (the "***Assignment and Assumption Agreement***").

3.3.2    A bill of sale, in the form attached as <u>Exhibit B</u> hereto, duly executed by Seller, pursuant to which Seller transfers any Saleable Assets to Purchaser (the "***Bill of Sale***").

3.3.3    A counterpart of an Assignment of Intangible Property, in the form attached as <u>Exhibit C</u> hereto, duly executed by Seller, pursuant to which Seller assigns to Purchaser its interests, if any, in and to the Intangible Property (the "***Assignment of Intangible Property***").

3.3.4    A certified copy of the order confirming the Plan of Liquidation.

3.3.5    A certificate duly executed by a senior officer of Seller, in a form reasonably satisfactory to Purchaser, to the effect that each of the conditions specified in <u>Sections 4.2.1</u> and <u>4.2.2</u> have been satisfied.

3.3.6    A certificate duly executed by an authorized officer of Seller to which is attached: (A) true, correct and complete copies of the organizational documents of Seller; (B) true, correct and complete copies of the resolutions of Seller's members and managers respecting the Contemplated Transactions; (C) a schedule respecting the incumbency and true signatures of the officers of Seller who execute this Agreement and the other Transaction Documents on behalf of Seller; and (D) a certificate from the Secretary of State of the State of Florida, dated within 10 days of the Closing Date, with respect to the existence and good standing of Seller. The certificate required pursuant to this <u>Section 3.3.6</u> shall certify that the documents referred to in (A) and (B) above and attached thereto are true, correct and complete copies, have been duly and validly adopted and have not been amended or altered except as reflected therein.

3.3.7    Evidence of payment or reserve for payment of all Administrative Expenses as allowed by the Bankruptcy Court in accordance with Section 503 of the Bankruptcy Code and agreed to by the Debtor and Purchaser, as well as evidence of reserve of an amount sufficient to satisfy the amount of any disputed Administrative Expense.

3.3.8    Seller's consent and authorization to the Escrow Agent authorizing the release of the Deposit to Seller.

3.3.9    Any such other documents, funds or other things reasonably contemplated by this Agreement to be delivered by Seller to Purchaser at the Closing.

3.4    <u>Purchaser's Deliveries to Seller at Closing.</u>    On the Closing Date, Purchaser shall make or cause to be made the following payments and deliveries to Seller:

3.4.1    The Cash Closing Payments.

3.4.2    A counterpart of the Assignment and Assumption Agreement, duly executed by Purchaser.

3.4.3    A counterpart of the Assignment of Intangible Property, duly executed by Purchaser.

3.4.4   Master Loan and Security Agreements in the form attached as Exhibit D hereto, duly executed by Purchaser and each of Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc., respectively (the "***Master Loan and Security Agreements***").

3.4.5   Evidence of satisfaction of the existing indebtedness of the Seller to the Persons set forth in Section 3.4.4.

3.4.6   Evidence of payment of, or adequate reserve for, all of the Administrative Expenses.

3.4.7   Purchaser's consent and authorization to the Escrow Agent authorizing the release of the Deposit to Seller.

3.5   Transferred Employees.

3.5.1   Not later than seven (7) days prior to the Confirmation Hearing, Seller will provide Purchaser with a certified list of all Business Employees.

3.5.2   Not later than five (5) days prior to the Confirmation Hearing, and effective as of the Closing Date, Purchaser shall offer employment to substantially all of the Business Employees identified on the certified list provided by Seller pursuant to Section 3.5.1 above on the same or substantially similar terms as those currently provided by Seller. Notwithstanding the foregoing, Purchaser shall not be under any obligation to offer employment to any particular Business Employee. The new employment of each Business Employee who accepts Purchaser's offer of employment shall commence with effect from the later of the Closing or the date of acceptance. Each Business Employee who accepts Purchaser's offer of employment and who becomes an employee of Purchaser as of the Closing shall be a "***Transferred Employee***." Each Transferred Employee shall be employed solely on an "at will" basis and Purchaser shall not be required to continue the employment of any particular Transferred Employee, except to the extent required by the provisions of a written employment Contract that is a Section 365 Contract or as required by applicable Law.

3.5.3   Purchaser will grant to all Transferred Employees service credit for previous service recognized by Seller for purposes of calculating vacation time earned following the Closing Date (but only to the extent that such credit does not create any duplication of benefits, and in no event for purposes of benefit accruals under any defined benefit retirement plan). In addition, Purchaser shall credit all Transferred Employees with accrued and unused vacation days as of the Closing Date.

3.5.4   Purchaser shall not be under any obligation to assume any Employee Benefit Plans or any liabilities under or with respect to Employee Benefit Plans (except, in Purchaser's sole discretion, as to any permitted "rollover" accepted by the applicable plan of Purchaser or one of its Affiliates that is elected by a Transferred Employee under a Employee Benefit Plan intended to be qualified under Section 401(a) of the Code). Seller acknowledges and agrees that it shall be solely responsible for terminating all of the Employee Benefit Plans and agrees to take all actions necessary and legally permissible in order to cause

distribution of any account balances under any Employee Benefit Plans intended to be qualified under Section 401(a) of the Code as soon as practicable following the Closing Date.

3.5.5   Seller will not implement a "plant closing" or "mass layoff" before the Closing Date without advance notification to and approval of Purchaser.  Seller shall comply with the WARN Act, as applicable, including provision of required notices.  Seller shall be responsible for and shall pay any and all liabilities or obligations arising under the WARN Act, if any, arising out of or resulting from layoffs of employees or any termination of their employment in the Business in connection with the Contemplated Transactions.

3.5.6   Purchaser will not take any action on the Closing Date that will, as a direct result of such action, result in a "plant closing" or "mass layoff" under the WARN Act.

3.5.7   Seller and Purchaser shall provide each other with such records and information as may be reasonably necessary, appropriate and permitted under applicable Law to carry out their obligations under this Section 3.5.

3.5.8   No provision of this Agreement confers rights or remedies upon any Person, including any Business Employee or Transferred Employee, other than the parties hereto.

3.5.9   The parties agree that, pursuant to the "Alternative Procedure" provided in Section 5 of Revenue Procedure 96-60, 1996-2 C.B. 399, with respect to filing and furnishing Internal Revenue Service Forms W-2, W-3, and 941, (i) Seller shall report on a "predecessor-successor" basis, as set forth therein, (ii) Seller shall be relieved from furnishing Forms W-2 to any of the employees of Seller who become employees of Purchaser, and (iii) Purchaser shall assume the obligations of Seller to furnish such Forms W-2 to such employees for the year in which the Closing occurs.

3.5.10  Purchaser shall adopt new employee benefit plans effective as of the Closing Date for all Transferred Employees providing the Transferred Employees with benefits coverage substantially similar to the coverage provided by Seller as of the date of this Agreement (the "*Purchaser Employee Benefit Plans*").

3.6   Taxes.

3.6.1   Transfer Taxes.  The Parties agree that there are no Transfer Taxes payable by reason of the purchase and sale of the Saleable Assets under this Agreement or the Contemplated Transactions as the purchase and sale of the Saleable Assets under this Agreement is exempt from Transfer Taxes consistent with Section 1146 of the Bankruptcy Code.  The Confirmation Order shall specifically order that the sale of the Saleable Assets are exempt from Transfer Taxes pursuant to Section 1146 of the Bankruptcy Code.

3.6.2   Tax Returns.  Seller, within the time period required by the applicable taxing authorities, shall prepare or cause to be prepared all Sales Tax Returns and Tax Returns relating to all personal property Taxes, or similar ad valorem obligations levied with respect to the Saleable Assets for the periods ending on or prior to the Closing Date.  Purchaser shall prepare and file all Sales Tax Returns and Tax Returns relating to all personal property

Taxes, or similar ad valorem obligations levied with respect to the Saleable Assets commencing on the 1st day of the month following the Closing Date. For any taxable period beginning on or before and ending after the Closing Date (a "**Straddle Period,**" and such Taxes, "**Straddle Period Taxes**"), whether imposed or assessed before or after the Closing Date, Seller shall prepare and file such Sales Tax Returns. The Liability for payment of each such Straddle Period Tax shall be prorated between Purchaser and Seller at the Closing Date based on 100% of the amount of such Straddle Period Tax imposed for the prior taxable period and shall be scheduled as an Administrative Expense of Seller. The portion of each such Straddle Period Tax that is allocable to Seller shall be the product of (i) 100% of the amount of such Tax for the prior taxable period and (ii) a fraction, the numerator of which is the number of days in the Tax period ending on the Closing Date and the denominator of which is the number of days in the entire Tax period. The amount of Tax allocable to Seller pursuant to this Section 3.6.2 shall be scheduled as an Administrative Expense. Purchaser and Seller shall be responsible for remitting their share of all Straddle Period Taxes to the appropriate Taxing authority when due.

3.6.3    Cooperation.    Seller and Purchaser agree to furnish to each other upon request, as promptly as practicable, such information and assistance relating to the Saleable Assets and the Business (including access to Business Records related to the Business) as is reasonably necessary for the filing of all Sales Tax Returns and other Tax filings, the making of any election related to Taxes, the preparation for any audit by any Taxing authority, and the prosecution or defense of any claim, suit or proceeding relating to any Tax Return. Seller and Purchaser shall cooperate with each other in the conduct of any audit or other proceeding related to Taxes. Seller and Purchaser shall provide timely notice to each other in writing of any pending or threatened Tax audits, assessments or litigation with respect to the Saleable Assets or the Business for any taxable period for which the other party may have Liability under this Agreement.

3.7    Possession.    Right to possession of the Saleable Assets shall transfer to Purchaser on the Closing Date. On the Closing Date, Seller shall:

3.7.1    Transfer and deliver to Purchaser on the Closing Date such keys, locks and safe combinations and other similar items as Purchaser may reasonably require to obtain occupation and control of the Saleable Assets;

3.7.2    Make available to Purchaser at their then existing locations the originals of all documents in Seller's possession that are required to be transferred to Purchaser by this Agreement; and

3.7.3    Transfer to Purchaser all electronic data (including, without limitation, data relating to customers, sales history, inventory, accounts receivable, vendors, employees (except to the extent prohibited by Law with respect to certain employee records) and accounts payable) relating to the operation of the Business and that is located or stored on computer files, with such electronic data to be in a form acceptable to Purchaser.

4.  <u>Conditions Precedent to Closing</u>.

      4.1    <u>Conditions to Seller's Obligations</u>.  Seller's obligation to make the deliveries required of Seller at the Closing and otherwise to close the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date, unless any such unsatisfied condition is waived by Seller, with the exception of <u>Section 4.1.4</u> below, which cannot be waived:

      4.1.1  Purchaser shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by it prior to the Closing.

      4.1.2  Each of the representations and warranties made by Purchaser in this Agreement shall have been accurate in all material respects as of the date of this Agreement (without giving effect to any materiality qualifications or similar qualifications contained or incorporated directly or indirectly in such representations and warranties), and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date (without giving effect to any materiality qualifications or similar qualifications contained or incorporated directly or indirectly in such representations and warranties).

      4.1.3  Purchaser shall have paid, delivered or funded all items required under <u>Section 3.4</u> of this Agreement to be paid, delivered or funded by Purchaser on or before the Closing.

      4.1.4  The Bankruptcy Court shall have entered the Confirmation Order in accordance with <u>Section 7.3.3</u> below, and the Confirmation Order shall have not been stayed.

      4.1.5  The Case shall not have been dismissed.

      4.1.6  Purchaser shall have adopted the Purchaser Employee Benefit Plans.

      4.1.7  Purchaser shall have received counterparts of employment agreements, each in a form reasonably acceptable to Purchaser, duly executed by certain individuals to be determined by Purchaser prior to Closing (the "***Employment Agreements***").

      4.2    <u>Conditions to Purchaser's Obligations</u>. Purchaser's obligation to make the deliveries required of Purchaser at the Closing, and otherwise to close the Contemplated Transactions, shall be subject to the satisfaction of each of the following conditions on or prior to the Closing Date, unless any such unsatisfied condition is waived by Purchaser:

      4.2.1  Seller shall have performed and complied with, in all material respects, each and every covenant or other obligation required to be performed by Seller prior to the Closing.

      4.2.2  Each of the representations and warranties made by Seller in this Agreement shall have been accurate in all material respects as of the date of this Agreement (without giving effect to any materiality qualifications or similar qualifications contained or

incorporated directly or indirectly in such representations and warranties), and shall be accurate in all material respects as of the Closing Date as if made on the Closing Date (without giving effect to any materiality qualifications or similar qualifications contained or incorporated directly or indirectly in such representations and warranties).

       4.2.3   Seller shall have delivered all items required under <u>Section 3.3</u> of this Agreement to be delivered by Seller on or before the Closing.

       4.2.4   The Bankruptcy Court shall have entered the Confirmation Order in accordance with <u>Section 7.3.3</u> below, and the Confirmation Order (i) shall be in form and substance reasonably acceptable to Purchaser and (ii) shall have not been stayed.

       4.2.5   The Case shall not have been dismissed.

       4.2.6   No action, suit or other proceedings shall be pending before any Government Entity seeking or threatening to restrain or prohibit the consummation of the Contemplated Transactions, or seeking to obtain substantial Damages in respect thereof, or involving a claim that consummation thereof would result in the violation of any Law.

       4.2.7   There shall be no injunction or court order restraining consummation of the Contemplated Transactions and there shall not have been adopted any Law making all or any portion of the Contemplated Transactions illegal.

       4.2.8   All consents, approvals and authorizations required to be obtained from, and all notices or applications required to be given or submitted to or filed with, any Government Entity shall have been obtained.

       4.2.9   All consents and approvals required to be obtained from, and all notices required to be given to, any party to a Section 365 Contract shall have been obtained or given, as required, and all Section 365 Contracts shall be freely assignable to Purchaser without any modifications thereto which are reasonably likely to adversely affect the Business on or after the Closing Date.

       4.2.10  Seller shall have notified all parties to the Section 365 Contracts of the Cure Amounts for each such contract so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such Cure Amounts no later than twenty (20) days prior to the Confirmation Hearing (or as otherwise ordered by the Bankruptcy Court).

       4.2.11  There shall not have occurred a Material Adverse Effect arising after the date of this Agreement.

       4.2.12  To the extent transferable, Seller shall have transferred to Purchaser or Purchaser shall have otherwise obtained all Permits required to operate the Business.

4.3    Grounds for Termination.    This Agreement may be terminated prior to the Closing only as follows:

4.3.1    by mutual written consent of Purchaser and Seller;

4.3.2    by Seller, at any time that there has been (i) a material breach by Purchaser of any of its representations and warranties herein or (ii) a material failure on the part of Purchaser to comply with its covenants and obligations herein; provided, that in each of (i) and (ii) such breach or failure to comply is not cured within twenty (20) days after written notice thereof;

4.3.3    by Seller, if any of the conditions in Section 4.1 has not been satisfied (other than by reason of the failure of Seller to comply with Seller's obligations under this Agreement), and Seller has not waived such condition, with the exception of Section 4.1.4 below, which cannot be waived;

4.3.4    by Purchaser, at any time that there has been (i) a material breach by Seller of any of its representations and warranties herein or (ii) a material failure on the part of Seller to comply with its covenants and obligations herein; provided, that in each of (i) and (ii) such breach or failure to comply is not cured within twenty (20) days after written notice thereof;

4.3.5    by Purchaser, if any of the conditions in Section 4.2 has not been satisfied (other than by reason of the failure of Purchaser to comply with Purchaser's obligations under this Agreement), and Purchaser has not waived such condition;

4.3.6    by either Seller or Purchaser, upon written notice to the other, if the Contemplated Transactions have not been consummated by March 31, 2011; provided, however, that, if the failure to consummate the Contemplated Transactions is due to material breach by the party attempting to terminate this Agreement, if such party is capable of curing such breach, such party shall have no right to do so;

4.3.7    by Purchaser, upon written notice to Seller, if the Confirmation Order has not been entered by the Bankruptcy Court prior to February 28, 2011; and

4.3.8    by Purchaser, upon written notice to Seller, if there is a Material Adverse Effect occurring between the date of this Agreement and the Closing.

4.4    Manner and Effect of Termination.    Any termination of this Agreement pursuant to Section 4.3 shall be effected by written notice from the terminating party to the other party, which notice shall specify the basis for the termination in reasonable detail.    Upon termination of this Agreement, this Agreement shall forthwith become null and void and of no further force and effect and all rights and obligations of the parties hereunder shall terminate without any Liability by any party to any other party, except for (a) the rights and obligations of any party arising out of the breach of this Agreement prior to termination and (b) the rights and obligations of the parties under Section 9.1, Section 9.2 and Section 9.11 hereof.  If Purchaser terminates this Agreement on or after the date on which all of Purchaser's conditions to close the Contemplated Transactions set forth in Section 4.2 have been satisfied, the Escrow Property shall be paid to Seller and upon such payment, this Agreement shall forthwith become null and void

and of no further force and effect and all rights and obligations of the parties hereunder shall terminate without any Liability by any party to any other party, except for (a) the rights and obligations of any party arising out of the breach of this Agreement prior to termination and (b) the rights and obligations of the parties under Section 9.1, Section 9.2 and Section 9.11 hereof.

5.    Seller's Representations and Warranties.    Except as specifically set forth on the disclosure schedules attached to this Agreement (the "*Disclosure Schedules*") (each part of which qualifies the correspondingly numbered section of the representation and warranty to the extent specified therein, except for disclosures specifically and explicitly incorporated by reference to another section), as a material inducement to Purchaser to enter into this Agreement and consummate the Contemplated Transactions, Seller hereby represents and warrants to Purchaser that the statements contained in this Article 5 are true and accurate on the date hereof and as of the Closing Date pursuant to Section 4.2.2.    Seller hereby represents and warrants to Purchaser as follows:

5.1    Due Organization.    Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Florida.    Seller is duly qualified to transact business and is in good standing as a foreign entity in each jurisdiction where the character of its activities requires such qualification, except where the failure to be so qualified could not reasonably result in a Material Adverse Effect.    Seller has heretofore made available to Purchaser accurate and complete copies of its certificate of formation, limited liability company agreement or other organizational documents as are currently in effect.

5.2    Power and Authority.    Subject to the authority of the Bankruptcy Court and the provisions of the Bankruptcy Code, Seller has all requisite limited liability company power and authority to own, lease and operate its properties, and to carry on the Business as it is now being conducted.

5.3    Authorization and Validity of Agreement.    Subject only to Bankruptcy Court approval pursuant to the Confirmation Order, Seller has full power and authority to execute and deliver this Agreement and the other Transaction Documents to which Seller is a party, to perform its obligations hereunder and thereunder, and to consummate the Contemplated Transactions.    The execution and delivery of this Agreement and the other Transaction Documents by Seller and the performance by Seller of its obligations hereunder and thereunder have been duly and validly authorized by all necessary action on the part of Seller.    This Agreement and each of the other Transaction Documents have been, or when executed and delivered will have been, duly executed and delivered by Seller and is, or once executed will be, the valid and binding agreement of Seller, enforceable against Seller in accordance with their terms.

5.4    No Conflicts.    Upon entry of the Confirmation Order, the execution, delivery and performance of this Agreement by Seller will not:  (i) conflict with or result in a breach of the certificate of formation or the limited liability company agreement of Seller, (ii) violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding Seller, or (iii) violate or conflict with or constitute a default under any Contract to which Seller is a party or by which Seller or any of the Saleable Assets may be

bound, except as otherwise permitted or authorized by the Bankruptcy Court in accordance with Section 363, 365 or 1129 of the Bankruptcy Code.

     5.5    <u>Title</u>. Seller has good and marketable title to (or in the case of leased assets, valid and enforceable rights in), is the lawful owner of and subject and pursuant to the Confirmation Order has the full right to sell, convey, transfer, assign and deliver the Saleable Assets to be sold by Seller free and clear of all Liabilities and Liens. No Affiliate of Seller has any interest in any of the Saleable Assets. Except as disclosed on <u>Schedule 5.5</u>, at the Closing, Purchaser will acquire all of Seller's right, title and interest in and to all of the Saleable Assets, free and clear of any Liens.

     5.6    <u>Compliance with Laws</u>.

     5.6.1   Except as excused by the Bankruptcy Court or in connection with the Case, (i) to Seller's knowledge, Seller is not in material violation of any Laws relating to the Business or the Saleable Assets, (ii) Seller has not been notified in writing nor does it have any Knowledge that it has been charged with or threatened in writing with any charge concerning any violation of any provision of any Law relating to the Business or the Saleable Assets that has not already been resolved and (iii) Seller is not in material violation of, or in default under, and no event has occurred which, with or without the lapse of time or the giving of notice, or both, would result in the material violation of or default under, the terms of any written Governmental Order related to the Saleable Assets or the Business.

     5.6.2   <u>Schedule 5.6.2</u> sets forth a list of all Permits held by Seller for the operation of the Business as currently conducted. All Permits are in full force and effect and constitute the valid, legal, binding and enforceable obligation of Seller. Seller is in compliance in all material respects with the Permits and no suspension or cancellation of any of the Permits is pending or, to the Knowledge of Seller, threatened. True and correct copies of each Permit listed on <u>Schedule 5.6.2</u> have been delivered to or made available to Purchaser. To Seller's Knowledge, each Permit set forth on <u>Schedule 5.6.2</u> is freely transferable to Purchaser.

     5.7    <u>Litigation</u>. There are no proceedings, claims (including counterclaims), suits, investigations or causes of action, by or before any court or Government Entity pending or, to the Knowledge of Seller, threatened against Seller that questions or challenges the validity of this Agreement or the other Transaction Documents or any action taken or proposed to be taken by Seller pursuant hereto or thereto or in connection with the Contemplated Transactions. Except for proceedings, claims (including counterclaims), suits, investigations or causes of action filed in the Bankruptcy Court, there are no proceedings, claims (including counterclaims), suits, investigations or causes of action by or before any court or Government Entity pending or, to the Knowledge of Seller, threatened against Seller that involves or affects the Saleable Assets or the Business.

     5.8    <u>Financial Information; Absence of Changes and Undisclosed Liabilities</u>.

     5.8.1   Seller has delivered to Purchaser its (i) audited balance sheet and related financial statements for the fiscal year ending December 31, 2008 (the "***Audited Financial Statements***"); (ii) its unaudited balance sheet as of May 31, 2010 and related financial

statements for the seventeen months ending May 31, 2010; and (iii) monthly financial reports through September 30, 2010; ((i), (ii) and (iii) collectively referred to herein as the "*Seller Financial Statements*"). Each of the Seller Financial Statements, were prepared from the books of account and other financial records of Seller and present fairly, as stated therein, in all material respects, the financial statements and results of operations and cash flows of Seller as of such date and the periods covered thereby, subject, in the case of unaudited statements to normal year-end adjustments and the absence of footnotes, the effect of which is immaterial. The Audited Financial Statements were prepared in accordance with GAAP, consistently applied throughout the periods indicated.

       5.8.2   Since September 30, 2010 there has not occurred any change, event, occurrence or condition that individually or, when taken together with any other changes, events, occurrences or conditions, collectively, could reasonably be expected to have a Material Adverse Effect.

       5.8.3   <u>Schedule 5.8.3</u> sets forth an aged receivables report, as of June 4, 2010 showing outstanding receivables, prepared in the ordinary course of business consistent with past practice, showing the periods for which such receivables have been outstanding. All receivables reflected on the Seller Financial Statements arose from bona fide transactions with unaffiliated third parties, net of applicable reserves for doubtful accounts in the ordinary course of business consistent with past practices.

       5.8.4   Except as reflected or reserved against in the Seller Financial Statements, Seller has no liabilities other than (i) liabilities incurred in the ordinary course of business consistent with past practice since September 30, 2010; (ii) fees and expenses incurred in connection with the preparation, filing and conduct of the Case and (iii) as reflected or reserved against in the Seller Financial Statements since September 30, 2010 through the date hereof.

     5.9   <u>Business Employees.</u>

       5.9.1   No increase in the salary, bonus, benefits or other compensation other than normal periodic increases in base compensation applied on a basis consistent with that of prior years with respect to Business Employees who are not officers or directors has been made (or promised) with respect to the period following the Closing Date. Seller has not entered into any Contract with respect to severance payments, nor does Seller have any policy with respect to the payment of severance. Seller has paid all withholding required by Law from Business Employees' pay.

       5.9.2   To Seller's Knowledge, Seller has complied in all material respects with all legal requirements relating to employment practices, terms and conditions of employment, equal employment opportunity, nondiscrimination, immigration, wages, hours, benefits, collective bargaining, the payment of social security and similar Taxes and occupational safety and health. Seller is not liable for the payment of any Taxes, fines, penalties, or other amounts, however designated, for failure to comply with any of the foregoing legal requirements.

     5.10   <u>Employee Benefit Plans.</u>

5.10.1 <u>Schedule 5.10.1</u> sets forth a list of all Employee Benefit Plans.

5.10.2 With respect to the Employee Benefit Plans, other than Seller's 401K Plan, (i) each of the Employee Benefit Plans has been operated and administered in all material respects in accordance with the terms of such plan, applicable Law and administrative or governmental rules and regulations, including ERISA and the Code, (ii) there are no pending or threatened claims by or on behalf of any of the Employee Benefit Plans, by any person covered thereby (other than ordinary claims for benefits submitted by participants or beneficiaries) or any Government Entity, agency or authority and neither Seller nor any ERISA Affiliate has any obligation under any Employee Benefit Plan or with respect to Purchaser would have any liability or that could result in a Lien attaching to the Saleable Assets, including without limitation any obligations of Seller or any ERISA Affiliate relating to: (A) any benefits provided under any life, medical or health plan (other than as an incidental benefit under any Employee Benefit Plan intended to be "qualified" within the meaning of Section 401(a) of the Code) that provides benefits to retirees or other terminated employees other than benefit continuation rights under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended ("***COBRA***"), (B) any transactions in violation of Section 406(a) or (b) of ERISA or Section 4975 of the Code with respect to any Employee Benefit Plan for which no exemption exists under Section 408 of ERISA or Section 4975(c) of the Code or Section 4975(d) of the Code or that would result in a civil penalty being imposed under subsections (i) or (l) of Section 502 of ERISA, or (C) any coverage under or failure to comply with COBRA.

5.10.3 Neither Seller nor any ERISA Affiliate contributes to or is required to contribute to any multiemployer plan.

5.10.4 <u>Schedule 5.10.4</u> sets forth, with respect to each Employee Benefit Plan that is a "group health plan" (as defined in Section 4980B(g) of the Code), a list of the names and contact information for each individual who: (1) is currently receiving health care continuation coverage under COBRA, (2) is eligible to receive health care continuation coverage under COBRA and with respect to whom the "election period" (as defined in Section 4980B(f)(5) of the Code) has not expired, or (3) will otherwise be an "M&A Qualified Beneficiary" (as such phrase is defined in Section 54.4980B-9, Q&A-4 of the Income Tax Regulations) in connection with the transactions contemplated by this Agreement.

5.11    <u>Labor Matters</u>.   To Seller's Knowledge, Seller has complied and is presently complying, in all material respects, with all applicable federal, state and local laws, regulations, ordinances and other requirements respecting employment and employment practices, terms and conditions of employment, immigration and wages and hours and is not engaged in any unfair labor practice or unlawful employment practice. Seller is not a party to any labor, collective bargaining or similar agreement, and currently there are no organizational campaigns, petitions or other unionization activities seeking recognition of a collective bargaining unit which could affect Seller.  There is no unfair labor practice charge or other complaint against Seller pending or threatened before the National Labor Relations Board, the Equal Employment Opportunity Commission, the Department of Labor or any similar state or local agency, nor is there any grievance or any arbitration proceeding arising out of or under any collective bargaining agreement.  There is no labor strike, slowdown or work stoppage pending or to Seller's knowledge, threatened against Seller.  To Seller's Knowledge, all Business

Employees are either United States citizens or resident aliens specifically authorized to engage in employment in the United States in accordance with all applicable Laws. Within the preceding five (5) years, Seller has not implemented any "plant closing" or "mass layoff" of employees that would reasonably be expected to require notification under the WARN Act or any similar state or local Law, and there has been no "employment loss" as defined by the WARN Act within the ninety (90) days prior to the Closing Date.

5.12    Taxes.

5.12.1 Seller has timely filed all Tax Returns required to be filed and all Taxes owed (whether or not shown or required to be shown on such Tax Returns) have been paid or remitted, in each case, to the extent such Taxes and Tax Returns related to the Saleable Assets or the operation of the Business that were required to be filed or paid by the Closing. All such Tax Returns were true, complete and correct in all material respects. No portion of any Tax Return that relates to the Saleable Assets or the operation of the Business has been the subject of any audit, Right of Action or examination by any Government Entity, and no such audit, Right of Action, or examination is pending or, to the Knowledge of Seller, threatened. Seller is not currently the beneficiary of any extension of time within which to file any Tax Return, and Seller has not waived any statute of limitation with respect to any Tax or agreed to any extension of time with respect to a Tax assessment. No claim has ever been made by a Government Entity in a jurisdiction where Seller does not file Tax Returns that it is or may be subject to taxation by that jurisdiction. There are no Liens for Taxes upon the Saleable Assets. Seller does not have, and has not had, a permanent establishment in any foreign country, as defined in any applicable Tax treaty or convention between the United States and such foreign country. Seller has no knowledge of any Liability for the Taxes of any Person (other than Seller) under Treasury Regulation Section 1.1502-6 (or any corresponding provision of Tax Law), as a transferee or successor, by Contract, or otherwise.

5.12.2 To Seller's knowledge, Seller has timely paid all Taxes, and all interest and penalties due thereon and payable by it which will have been required to be paid on or prior to the Closing Date, the non-payment of which would result in a Lien on any Saleable Asset, would otherwise adversely affect the Business or would result in Purchaser becoming liable or responsible therefor.

5.12.3 Seller has established a reserve (either as an Administrative Claim or a Priority Claim) for tax claims which arise from or with respect to the Saleable Assets or the operation of the Business and were incurred in or attributable to the period prior to the Closing Date, the non-payment of which would result in a Lien on any Saleable Asset, would otherwise adversely affect the Business or would result in Purchaser becoming liable therefor.

5.12.4 Seller has withheld and paid or has made provision for the payment of all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, stockholder, independent contractor, creditor, or other third party.

5.12.5 Schedule 5.12.5 contains a list of all jurisdictions (whether foreign or domestic) to which any Tax is properly payable by Seller.

5.13    Contracts.

5.13.1 Schedule 5.13.1 sets forth a true and complete list of Contracts to which Seller is a party (the "**Material Contracts**"). Each Material Contract is a valid Contract, subject to the Bankruptcy Code in the case of the Section 365 Contracts, enforceable against the parties thereto in accordance with the terms and conditions of said Contract and under applicable Law. There are no proceedings, claims (including counterclaims), suits, investigations or causes of action by or before any court or Government Entity pending or, to the Knowledge of Seller, threatened by or against Seller that question or challenge the validity of any Material Contract. Each Material Contract is enforceable in accordance with its terms, subject to applicable receivership, conservatorship and supervisory powers of bank regulatory agencies as well as bankruptcy, insolvency, reorganization, moratorium or similar Laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights generally and subject to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

5.13.2 Seller has duly performed, in all material respects, all its obligations under each Material Contract to the extent that such obligations to perform have accrued, and no material breach or material default, or, to Seller's Knowledge, alleged material breach or material default or event that would (with or without the passage of time, notice or both) constitute a breach or default by Seller thereunder has occurred.

5.13.3 No breach, default or loss, or, to the Knowledge of Seller, alleged breach, default, loss, or event that would (with the passage of time, notice or both) constitute a material breach, default or loss by any third party has occurred with respect to any Material Contract. No party to any Material Contract has exercised any termination rights with respect thereto, and no party has given notice of (i) any intent to exercise any termination rights with respect thereto or (ii) any significant dispute with respect to any Material Contract.

5.13.4 Seller has delivered to Purchaser a true, correct and complete copy of all written Material Contracts and all amendments or modifications thereto. Other than as provided to Purchaser prior to the date hereof, there have not been any material amendments or modifications to any Material Contract.

5.14    Real Property.    Seller does not own, and never has owned, any real property.

5.15    Environmental Matters.

Except as set forth on Schedule 5.15:

5.15.1 There are no past, pending or to Seller's knowledge, threatened Environmental Claims against Seller or involving the Saleable Assets. Neither Seller nor any of the Saleable Assets is subject to any outstanding written order, consent decree or settlement agreement relating to any Environmental Law, any Environmental Claim, or any Hazardous Materials.

5.15.2 No material Release or, to Seller's Knowledge, threat of material Release has occurred on, at, to or from any of the Saleable Assets or any facility owned, leased or operated by Seller, now or in the past. There are and have been no conditions, occurrences, or activities which could reasonably be expected to form the basis of an Environmental Claim against Seller or any of the Saleable Assets.

5.15.3 Seller has not received any written notice under any Environmental Law indicating past or present treatment of Hazardous Materials at any of the Saleable Assets, or any Release or threatened Release of any Hazardous Materials at any of the Saleable Assets or at any location currently or in the past owned, leased or operated by Seller. Seller's operations with respect to the Saleable Assets do not involve the generation, transportation, treatment, storage or disposal of Hazardous Materials.

5.15.4 Compliance with all current or reasonably foreseeable future requirements pursuant to or under Environmental Law could not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect.

5.15.5 Seller and the Saleable Assets are and have been in material compliance with Environmental Law. Seller holds all permits, authorizations, licenses, registrations or other permissions required under Environmental Law ("***Environmental Permits***") for the operation of the Business and the Saleable Assets. Such Environmental Permits are in full force and effect and no grounds exist for the revocation or suspension of such Environmental Permits. As applicable, Seller has filed applications for the renewal of such Environmental Permits so that they remain in full force and effect during the pendency of the application.

5.16    Intellectual Property.    Schedule 1.1.3 sets forth all issued Patents and Patent applications, registered Trademarks and application to register Trademarks, and registered copyrights and applications to register copyrights that are owned by Seller, all of which are included in the Intellectual Property. To Seller's knowledge, Seller is the sole owner of the entire right, title and interest in, or possesses valid and sufficient licenses or other rights to the Intellectual Property. There are no infringements or misappropriations by any third party of any of the Intellectual Property. There is no pending, or to the Knowledge of Seller, threatened, Right of Action to which Seller is a party claiming that Seller has infringed any intellectual property or proprietary rights of a third party. The execution, delivery and performance of this Agreement and the other Transaction Documents by Seller and the consummation of the Contemplated Transactions will not breach, violate or conflict with any instrument or agreement concerning the Intellectual Property. The operations of the Business do not result in the infringement of any intellectual property or proprietary right of any third party. There are no consents required in connection with the assignment and transfer of the Intellectual Property to Purchaser in connection with the consummation of the Contemplated Transactions under this Agreement.

5.17    Insurance.    Seller maintains the insurance policies set forth on Schedule 5.17. Such policies are in full force and effect. Seller has paid all premiums on such policies due and payable prior to the date of this Agreement. To Seller's knowledge, Seller has not done anything by way of action or inaction that invalidates any such policies in whole or in part or

limits or impairs the coverage under any such insurance policies. Seller has no pending claims for benefits under such policies. Seller has provided Purchaser with true, complete, correct and current copies of all of the foregoing insurance policies.

5.18   Full Disclosure.   None of the representations made by Seller in this Agreement, nor any certificate or document furnished by Seller pursuant to this Agreement or any Transaction Document contains any untrue statement of a material fact or omits to state any material fact necessary to make the statements contained herein or therein not misleading.

5.19   Bankruptcy Schedules.   Seller has delivered, or caused to be delivered to Purchaser or its counsel, a true, correct and complete copy of the Schedules of Assets and Liabilities and Schedule of Executory Contracts and Unexpired Leases, that have been filed by Seller with the Bankruptcy Court, together with all amendments thereto.

6.   Purchaser's Representations and Warranties.   Purchaser represents and warrants to Seller as follows:

6.1   Due Organization.   Purchaser is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

6.2   Power and Authority.   Purchaser has all requisite limited liability company power and authority to own, lease and operate its properties, to carry on its business as now being conducted and to execute, deliver and perform this Agreement.

6.3   Authorization and Validity of Agreement.   All limited liability company action on the part of Purchaser necessary to approve the execution, delivery and performance of this Agreement by Purchaser has been taken. This Agreement, when executed and delivered by Purchaser, shall constitute the valid and binding obligation of Purchaser enforceable in accordance with its terms.

6.4   No Conflicts.   The execution, delivery and performance of this Agreement by Purchaser do not and will not: (i) conflict with or result in a breach of the certificate of formation or limited liability company agreement of Purchaser, (ii) materially violate any material statute, law, rule or regulation, or any order, writ, injunction or decree of any Government Entity binding on Purchaser, or (iii) materially violate or conflict with or constitute a material default under any agreement, instrument or writing of any nature to which Purchaser is a party or by which Purchaser or its assets or properties may be bound.

7.   Other Agreements of the Parties.

7.1   Access to Business Information of Seller.   From and after the date of this Agreement until the Closing Date, Seller shall, upon reasonable advance notice, afford to Purchaser and its Affiliates and Representatives, including Prophet Equity, LP, complete access during reasonable business hours to Seller's Facility, and all books, records, financial statements, and other documents and materials pertaining to Seller's Facility or the Business and the officers, employees, independent contractors, customers, suppliers, vendors, agents, and books and records of Seller as Purchaser and its Affiliates and Representatives may require to conduct its due diligence investigation. Seller shall cause its personnel and Representatives to reasonably

cooperate with any reasonable request of Purchaser or any of its Affiliates or Representatives in connection with Purchaser's investigation. Purchaser shall not exercise its rights to access in any manner that interferes with the conduct of the Business by Seller.

       7.2    <u>Conduct of Business Before Closing</u>. During the period prior to the Closing Date, Seller shall carry on its business diligently and in the ordinary course only, and shall use its diligent and commercially reasonable efforts (taking into account its status as a Debtor and the financial and other constraints that such status may impose upon Seller) to preserve its current business organization intact, to preserve the goodwill associated with the Business and Seller's name and brand and to preserve its current relationships with customers and other persons having business dealings with the Business. Without limiting the generality of the foregoing, except as expressly contemplated by this Agreement and except as may be required under the Bankruptcy Code, other applicable Law or any ruling or order of the Bankruptcy Court, Seller shall ensure that, without Purchaser's prior written consent:

       7.2.1    Seller shall not enter into any Contract or amend, modify or terminate any Contract, except as required by the Bankruptcy Code;

       7.2.2    Seller shall not directly or indirectly sell or otherwise transfer, or offer, agree or commit (in writing or otherwise) to sell or otherwise transfer, any of the Saleable Assets other than the sale of inventory in the ordinary course of business;

       7.2.3    Seller shall not permit, offer, agree or commit (in writing or otherwise) to permit, any of the Saleable Assets to become subject, directly or indirectly, to any Lien;

       7.2.4    Seller shall not commence any Right of Action, other than (i) collection, default or other proceedings in the ordinary course of business, or (ii) pursuant to Chapter 5 of the Bankruptcy Code;

       7.2.5    Seller shall not enter into any transaction or take any other action that could be reasonably expected to cause or constitute a breach of any representation or warranty made by Seller in this Agreement;

       7.2.6    Seller shall notify Purchaser promptly in writing of any Material Adverse Effect;

       7.2.7    Seller shall not make any promise or representation, oral or written, to, or otherwise (i) increase the annual level of compensation payable or to become payable by Seller to any of its directors or Business Employees, (ii) grant, or establish or modify any targets, goals, pools or similar provisions in respect of, any bonus, benefit or other direct or indirect compensation to or for any director or Business Employee, or increase or decrease the coverage or benefits available under any (or create any new) Employee Benefit Plan or (iii) enter into any employment, deferred compensation, severance, consulting, non-competition or similar agreement (or amend any such agreement) to which Seller is a party or involving a director or Business Employee of Seller, except, in each case, as required by Law, or as required by any Employee Benefit Plans, programs or agreements existing on the date hereof;

7.2.8    Seller shall not engage in any transaction with any officer, director or Affiliate of Seller or any Person known by Seller to be an Affiliate of any such individual except as authorized by the Bankruptcy Court;

7.2.9    Seller shall maintain in full force and effect existing policies of insurance with respect to the Business or replacement insurance;

7.2.10  Seller shall not amend, modify, supplement or otherwise alter customer credit policies except as may be required to comply with applicable Laws; or cancel or compromise any material debt or claim, or waive or release any material right of Seller that constitutes a Saleable Asset, other than in the ordinary course of the business of Seller;

7.2.11  Seller shall not transfer, dispose of, permit to lapse (except in accordance with the terms thereof) or grant any right or licenses under, or enter into any settlement regarding the breach or infringement of, any Intellectual Property, or modify any existing rights with respect thereto or enter into any material licensing or similar agreements or arrangements, other than such licenses, agreements or arrangements entered into in the ordinary course of business consistent with past practices and as could not reasonably be expected to have a Material Adverse Effect;

7.2.12  Seller shall not declare, set aside, or pay any dividend or other distribution with respect to any of its membership interests, or split, combine, or reclassify any of its membership interests, or repurchase, redeem, or otherwise acquire any of its membership interests;

7.2.13  Seller shall not change its corporate structure or merge or consolidate with any other Person or acquire a material amount of the assets of any other Person other than purchases of inventory in the ordinary course of business;

7.2.14  Seller shall not incur any indebtedness for money borrowed;

7.2.15  Seller shall not change any method of Tax accounting or make a Tax election or change an existing Tax election with respect to the Business; and

7.2.16  Seller shall not agree, commit or offer (in writing or otherwise), to take any of the actions described in this Section 7.2.


7.3      Bankruptcy Court Approvals.

7.3.1    Identification of Section 365 Contracts. On or before the twenty-fifth (25th) day prior to the Confirmation Hearing, Purchaser will provide Seller with a written list of the Section 365 Contracts identified and designated to be assumed and assigned by Seller to Purchaser.

7.3.2    Notice to Section 365 Contract Counter Parties. On or before the twentieth (20th) day prior to the Confirmation Hearing, Seller will provide notice to all parties to

the Section 365 Contracts identified by Purchaser pursuant to <u>Section 7.3.1</u> above of the Cure Amounts for each such contract so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such Cure Amounts pursuant to the deadlines established by the Bankruptcy Court.

        7.3.3   <u>Confirmation Order</u>. Prior to Closing, the Bankruptcy Court shall have entered the Confirmation Order, which, among other things, (i) confirms the Plan of Liquidation (as may be amended or modified), pursuant to 11 U.S.C. § 1129; (ii) approves the sale of the Saleable Assets to Purchaser on the terms and conditions set forth in this Agreement and authorizes Seller to proceed with the Contemplated Transactions, (iii) includes a specific finding that Purchaser is a good faith purchaser of the Saleable Assets pursuant to 11 U.S.C. § 363(m) and that 11 U.S.C. §363(n) is inapplicable, (iv) states that the sale of the Saleable Assets to Purchaser shall be free and clear of all Liens, (v) approves Seller's assumption and assignment to Purchaser of the Section 365 Contracts (subject to Purchaser providing adequate assurance of future performance to the counter-party thereto), (vi) is binding on any successor Chapter 11 or Chapter 7 trustee; and (vii) waives any applicable stay period.

      7.4   <u>Executory Contracts</u>.

        7.4.1   Seller shall take all steps necessary under the Bankruptcy Code to seek authority to assume and assign to Purchaser the Section 365 Contracts under the Plan of Liquidation (as may be amended or modified). Purchaser shall provide adequate assurance of future performance, as necessary to allow Seller to assume and assign all Section 365 Contracts. Seller shall notify all parties to the Section 365 Contracts of the Cure Amounts for each such contract so as to enable any such party to object to the proposed Cure Amounts and the Bankruptcy Court to determine such Cure Amounts no later than twenty (20) days prior to the Confirmation Hearing (or as otherwise ordered by the Bankruptcy Court).

      7.5   <u>Certain Notices</u>. Seller shall provide notice of the Confirmation Hearing to all applicable Taxing authorities and to all other parties having Liens of record in the Saleable Assets.

      7.6   <u>Reasonable Commercial Efforts</u>.

        7.6.1   Seller and Purchaser shall use their respective reasonable commercial efforts to take, or cause to be taken, all actions, or do, or cause to be done, all things, necessary to consummate the Contemplated Transactions as promptly as practicable, and neither Seller nor Purchaser shall take any action after the date hereof (other than any action required to be taken under this Agreement or to which the other shall have granted its consent) that could reasonably be expected to materially delay the consummation of the Contemplated Transactions. Each party hereto shall act in good faith in connection with the performance of any obligations under this Agreement to the other parties hereto, whether before or after the Closing.

        7.6.2   In furtherance and not in limitation of <u>Section 7.6.1</u>, Seller shall use its reasonable commercial efforts to obtain all consents and approvals of any Government Entity or any other Person (including Bankruptcy Court approvals) necessary in order to transfer any of the Saleable Assets from Seller to Purchaser or otherwise to consummate the

Contemplated Transactions.   Purchaser shall cause its personnel and Representatives to cooperate fully with the reasonable requests of Seller and its Representatives, accountants and counsel in connection with obtaining such consents and approvals.

7.6.3   In furtherance and not in limitation of <u>Section 7.6.1</u>, Seller and Purchaser shall use their respective reasonable commercial efforts to make and obtain approval of all filings with all Government Entities for the issuance and/or transfer to Purchaser of the Permits necessary in order for Purchaser to operate the Business and own and operate the Saleable Assets from and after the Closing Date.   Seller shall cause its personnel and Representatives to cooperate fully with the reasonable requests of the Purchaser and its Representatives and Affiliates in connection with such issuance and/or transfer of such Permits

7.7    <u>Access to Information and Other Post-Closing Cooperation</u>.

7.7.1   The parties acknowledge that after the Closing, Seller or its successors may need access to Business Records in the control of Purchaser for the purposes of concluding the Contemplated Transactions, preparing or filing Tax returns or responding to audits, to wind up the affairs of Seller, to close the Case, to satisfy other legal requirements, or to prosecute or defend third party claims (including, without limitation, the pursuit of any avoidance, preference or similar actions).

7.7.2   Purchaser shall not dispose of or destroy any of the Business Records prior to the fourth anniversary of the Closing Date.

7.7.3   Until the third anniversary of the Closing Date, Purchaser shall permit Seller, Seller's Representatives, and other professionals employed in the Case reasonable access to the Business Records that were in existence as of the Closing Date for the purposes described in <u>Section 7.7.1</u>, which access shall include (i) the right of such Persons to copy, at Purchaser's expense, such documents and records as they may request in furtherance of such purposes and (ii) Purchaser's copying and delivering to such Persons such documents and records as they may request, but only to the extent such Persons furnish Purchaser with reasonably detailed written descriptions of the materials to be so copied that Seller, Seller's Representatives and other professionals shall not have access to any materials protected by the attorney-client privilege without the consent of Purchaser, which consent shall not be unreasonably withheld.

7.8    <u>Brokerage Obligations</u>.  Except for PCE Investment Bankers, Inc., the fees owed to which will be paid by Purchaser, Seller and Purchaser each represent and warrant to the other that, such party has incurred no Liability to any broker or agent with respect to the payment of any commission regarding the consummation of the Contemplated Transactions.

7.9    <u>Cash and Cash Equivalents</u>.  If, on or after the Closing Date, Seller receives any check or other amount arising from or relating to the Business and part of the Saleable Assets, such check or cash (i) shall be held in trust for the benefit of Purchaser, (ii) shall be segregated from the other property or funds of Seller, (iii) in the case of checks, shall be duly and properly endorsed to Purchaser in accordance with such instructions as Purchaser shall from time to time furnish to Seller, (iv) in the case of checks, shall be forwarded at Purchaser's

expense, no later than three (3) Business Days after the date of receipt thereof by Seller, using a nationally recognized overnight delivery service designated by Purchaser for next-day delivery to Purchaser and (v) in the case of cash in a form other than a check, shall be promptly forwarded to Purchaser in such manner as Purchaser shall from time to time direct.

       7.10   <u>Update of Disclosure Schedules</u>.  Seller shall no later than seven (7) days prior to the Confirmation Hearing, supplement in writing the Disclosure Schedules with respect to any event, matter, condition or circumstance first arising after the date of this Agreement that, if existing or known as of the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedules and that does not arise out of a breach by Seller of a covenant in this Article 7; provided, that no update to any Disclosure Schedule will be deemed to cure any breach of any representation or warranty of Seller made in this Agreement.

       7.11   <u>Cooperation</u>.  For a period of six (6) months after the Closing, Purchaser and Seller covenant and agree to cooperate with one another, as reasonably requested by the other party and for no additional consideration, in the physical transfer, conveyance and delivery of the Saleable Assets to Purchaser and the retention of the Excluded Assets by Seller and the subsequent conveyance and transfer of such Excluded Assets to certain lenders of Seller.  Seller shall duly execute, acknowledge and deliver all such further deeds, assignments, transfers, conveyances and powers of attorney and take such other actions and give such assurances as may be reasonably required to convey to and vest in Purchaser and to protect its right, title and interest in and enjoyment of all the Saleable Assets and as may be appropriate otherwise to carry out the transactions contemplated by this Agreement.  Seller acknowledges that Purchaser's retrieval of the Saleable Assets from Seller's leased facility located at 1360 N.W. 33rd Street, Pompano Beach, Broward County, Florida ("***Seller's Facility***") will be a significant undertaking and may take substantial time to complete.  Subject to the Terms and Conditions set forth in Debtor's Ex-Parte Motion, ***Debtor's Ex-Parte Motion for Extension of Time Within Which To Assume or Reject Unexpired Leases of Non-Residential Real Property (the "Motion")***, in connection with the foregoing and subject to Lessor (as defined in the Motion) receiving payment for all sums due during the period of such access, (pursuant to the Terms of the Florida Lease as defined in the Motion) following the Closing, Seller agrees to grant Purchaser full access to Seller's Facility on or after the Closing to retrieve the Saleable Assets and to begin operation of Purchaser's business.

      8.   <u>Definitions</u>.  For purposes of this Agreement, the following terms have the meanings set forth below:

      "<u>Administrative Expenses</u>"  means those administrative expenses (as defined by the Bankruptcy Code) applicable to the Case.

      "<u>Affiliate</u>" means a Person that directly or indirectly, through one or more intermediaries, controls, is controlled by or is under common control with the Person specified.  For purposes of this definition, the term "control" of a Person means the possession, direct or indirect, of the power to (i) vote 50% or more of the voting securities of such Person or (ii) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise, and the terms and phrases "controlling," "controlled by" and "under common control with" have correlative meanings.

"Assumed Liabilities" means (i) all Liabilities of Seller accruing under the Section 365 Contracts on or after the Closing Date (not including any Cure Amounts), (ii) all Liabilities of Seller for any required COBRA continuation coverage to "M&A Qualified Beneficiaries" (as defined in Treasury Regulation Section 54.4980B-9, Q/A-4), and (iii) those Liabilities listed on Schedule 2.4.

"Business" means specialized crane rental services, including the provision of skilled crane operators and related project planning and logistics services, as and where conducted by Seller immediately before the Closing Date.

"Business Day" means any day of the year on which national banking institutions in the state of New York are open to the public for conducting business and are not required or authorized to close.

"Business Employee" means any individual who is employed by Seller immediately before the Closing and is listed on the certified list to be provided by Seller in accordance with Section 3.5.1 of this Agreement.

"Business Prepaid Items" means all prepaid rentals, deposits (including customer deposits and security for rent, electricity, telephone or otherwise), advances, claims for refunds and prepaid charges and expenses of Seller, including any prepaid rent, rights of offset in respect thereof and all retentions or holdbacks of Seller.

"Business Records" means business records (in any form or medium), including, without limitation, all books, ledgers, files, reports, plans, records, manuals, sales and credit records, studies, surveys, advertising and sales material, customer lists, customer records, test records, financing records, and personnel and payroll records, to the extent they are related to the Business and not related primarily to an Excluded Asset, other than (a) any Bankruptcy Court filings or documents related to or necessary for winding up of Seller and the administration of the Case, (b) any materials about employees, disclosure of which would violate an employee's reasonable expectation of privacy and (c) any materials that are subject to attorney-client privilege.

"Cash Closing Payments" means (i) the payment of $3,960,000 to Bank Midwest, N.A., (ii) the payment of $2,200,000 (such amount to be adjusted up or down on a dollar-for-dollar basis by the amount by which Seller's net accounts receivable at Closing are higher or lower than $2,937,000 as provided in the Plan of Liquidation) to Bank Midwest, N.A., (iii) the payment of $6,310,000 to SL Financial Services Corporation and (iv) the payment of $2,070,000 to Wells Fargo Equipment Finance Inc.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confirmation Hearing" means the hearing conducted by the Bankruptcy Court at which Seller will seek confirmation of the Plan of Liquidation, as may be amended or modified, which includes the sale of the Saleable Assets.

"Contemplated Transactions" means the purchase and sale of the Saleable Assets and all other transactions contemplated by the Transaction Documents.

"Contract" means any agreement, contract, lease, sublease, rental agreement, or similar agreement, purchase order, arrangement, commitment, Permit or license (other than this Agreement or any instruments executed or delivered in connection herewith) in effect as of the Closing and related to the Business, or to which any of the Saleable Assets are subject, whether written or oral, except to the extent included in the Excluded Assets.

"Cure Amounts" means all cure amounts owing under any Section 365 Contracts as of the Closing Date that the Bankruptcy Court may order to be paid as a condition to Purchaser's assumption and assignment of any of the Section 365 Contracts.

"Damages" shall mean (i) the amount of all losses, liabilities, obligations, claims, damages, liens, deficiencies, costs and expenses (including, without limitation, reasonable attorneys' and accountants' fees), penalties, fines or diminution of value, whether or not involving a third-party claim, and (ii) all reasonable expenses of investigation and monitoring, reasonable costs of containment, abatement, removal, repair, clean up, restoration, remedial work and other reasonable response costs.

"Debtor" means Seller in its capacity as debtor and debtor in possession under the Bankruptcy Code.

"Employee Benefit Plans" means all "employee benefit plans" within the meaning of Section 3(3) of ERISA, all formal written plans and all other compensation and benefit plans, contracts, policies, programs and arrangements of Seller or any of its ERISA Affiliates (other than routine administrative procedures) in connection with the Business in effect as of the date hereof (whether written or unwritten), including all pension, profit sharing, savings and thrift, bonus, stock bonus, stock option or other cash or equity-based incentive or deferred compensation, salary continuation, sick leave, vacation, holiday, severance pay and medical, dental, accident, disability and life insurance plans in which any of the Business Employees or their dependents participate or for which Seller or any ERISA Affiliate has any obligation or Liability, contingent or otherwise (whether or not Seller or such ERISA Affiliate still maintains such plan, arrangement, contract, policy, plan or program).

"Environmental Claim" means any investigation, notice, notice of violation, claim, action, suit, proceeding, demand, obligation, allegation, accusation, judgment, Lien, injunction, penalty, fine, abatement order, costs of cleanup, removal or other remedial action or other order or directive (conditional or otherwise) arising (i) pursuant to or in connection with any actual or alleged violation of any Environmental Law, (ii) in connection with any Hazardous Material or any actual or alleged Hazardous Materials Activity, (iii) in connection with a Release or alleged Release, or (iv) in connection with any actual or alleged damage, injury, threat or harm to health, safety, natural resources or the environment.

"Environmental Law" means any and all current or future foreign or domestic, federal or state (or any subdivision of either of them), statutes, ordinances, orders, rules, regulations, judgments, Governmental Orders, directives, guidance or any other requirements of Governmental Entities (including without limitation the common law) relating to (i) environmental matters, including without limitation those relating to any Hazardous Materials Activity, air pollution, water pollution, or noise control, (ii) the generation, use, storage,

transportation, investigation, removal, remediation or disposal of Hazardous Materials, (iii) occupational safety and health, industrial hygiene, land use or (iv) the protection of human, plant or animal health or welfare or the protection of protected species or biota or environmentally sensitive areas, and including without limitation the Comprehensive Environmental Response, Compensation and Liability Act and similar laws.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" means any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or Section 414 of the Code.

"ERISA Affiliate Reimbursement" means any trade or business, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA or Section 414 of the Code.

"Escrow Agent" means The Bank of New York Mellon Trust Company, N.A.

"Escrow Agreement" means that certain Escrow Agreement dated as of _____ __, 2010, by and among the Escrow Agent, Purchaser and Seller.

"Escrow Property" shall have the meaning as set forth in the Escrow Agreement.

"Estate" means each estate created pursuant to Section 541(a) of the Bankruptcy Code upon the commencement of the Case.

"Excluded Assets" means (i) Liquid Assets and Financial Instruments, (ii) all minute books, stock transfer records and corporate seal of Seller, (iii) all Tax Returns of Seller and working papers related thereto, (iv) all rights and claims in or to any refunds or credits of or with respect to any Taxes paid by Seller in respect of a pre-Closing period, (v) all Retained Rights of Action, (vi) Seller's rights under, and all cash and non-cash consideration payable to Seller pursuant to the terms and provisions of, this Agreement or any other agreements between Seller, on the one hand, and Purchaser or any of its Affiliates, on the other hand, entered into on or after the date of this Agreement, (vii) all Employee Benefit Plans of Seller and all rights in connection therewith or with respect to the assets thereof, (viii) all insurance policies of Seller in effect on the Closing Date, and all claims to insurance proceeds thereunder, but only to the extent such proceeds relate to the Excluded Assets or Excluded Liabilities, (ix) the Retained Contracts, (x) all Permits that are not transferable to Purchaser, (xi) the Liquidating Trust under the Plan of Liquidation, (xii) the Unsecured Creditor Carve Out, and (xiii) the specific assets listed on Schedule 1.2.

"Government Entity" means any federal, state, local or foreign court, administrative body or other governmental entity with competent jurisdiction.

"Governmental Order" means any Law, order, judgment, injunction, decree, stipulation or determination issued, promulgated or entered by or with any Government Entity of competent jurisdiction.

"Hazardous Materials" means any chemical, material or substance, exposure to which is prohibited, limited or regulated by any Government Entity or which may or could pose a hazard to the health and safety of any person.  Hazardous Materials shall include but shall not be limited to asbestos, petroleum or any fraction thereof.

"Hazardous Materials Activity" means any past, current, proposed or threatened activity, event, condition or occurrence involving any Hazardous Materials, including the use, manufacture, possession, storage, holding, presence, existence, location, Release, threatened Release, discharge, placement, generation, transportation, processing, construction, treatment, investigation, abatement, removal, remediation, disposal, disposition or handling of any Hazardous Materials, and any corrective action or response action with respect to any of the foregoing

"Intangible Property" means all intangible personal property related to the Business, including, without limitation, all goodwill of the Business; all Intellectual Property; all Business Records; all guaranties, warranties, indemnities and similar rights in favor of Seller to the extent related to any of the Saleable Assets; all credits, prepaid expenses, deferred charges, security deposits, prepaid items and duties to the extent primarily related to a Saleable Asset; all licenses and Permits issued to Seller by any Government Entity related to the Business, to the extent such licenses and Permits are assignable under the Bankruptcy Code; all income, royalties or payments due and payable, including, without limitation, all claims for Damages by reason of past, present and future infringement, and all legal privileges associated therewith; all suits, claims, charges and causes of action against third parties; and, to the extent transferable or assignable, telephone exchange numbers identified with the Business.  As used in this Agreement, Intangible Property shall in all events exclude, (i) any Excluded Asset, (ii) any Bankruptcy Court filings or documents related to or necessary for winding up of Seller and the administration of the Case, (iii) any materials containing communications or information about employees, disclosure of which would violate an employee's reasonable expectation of privacy, (iv) any other materials subject to attorney-client, work product or any other privilege or requirement to maintain confidentiality, (v) any Intangible Property held by Seller pursuant to a license or other Retained Contracts, and (vi) any license, permit or approval which would be deemed to be an executory contract pursuant to Section 365 of the Bankruptcy Code.

"Intellectual Property" means the following, to the extent owned by Seller, or used in the Business: (i) trademarks, service marks, brand names, certification marks, collective marks, d/b/a's, domain names, logos, symbols, trade dress, assumed names, fictitious names, trade names and other indicia of origin, all applications and registrations for the foregoing, including all renewals of same (collectively, "*Trademarks*"), (ii) inventions and discoveries, whether patentable or not, and all patents, registrations, invention disclosures and applications therefor, including divisions, continuations, continuations-in-part and renewal applications, and including renewals, extensions and reissues (collectively, "*Patents*"), (iii) trade secrets, confidential information and know-how, including processes, schematics, business methods, formulae, drawings, prototypes, models, designs, customer lists and supplier lists (collectively, "*Trade Secrets*"), (iv) published and unpublished works of authorship, whether copyrightable or not (including without limitation databases and any compilations or information), and (v) any other intellectual property or proprietary rights.

"Inventory" means all supplies, goods, materials, raw and finished goods, work in process, inventory and stock in trade owned by Seller as of the Closing Date, including but not limited to spare parts, supplies of business forms, and packing materials, other than any Excluded Assets.

"Knowledge" means, with respect to Seller, the actual knowledge, after reasonable investigation, of James Robertson and Matt Sollars.

"Law" means any law, decree, ordinance, regulation, rule, code or rule of common law, or otherwise of any Government Entity.

"Liability" means any claim, debt, liability or obligation of any kind whatsoever, whether arising under contract or applicable Law or in connection with a business, and whether conditioned or absolute, liquidated or unliquidated, contingent or non-contingent.

"Lien" means any lien, claim, charge, pledge, security interest, conditional sale agreement or other title retention agreement, lease, mortgage, option or other encumbrance (including the filing of, or agreement to give, any financing statement under the Uniform Commercial Code of any jurisdiction).

"Liquid Assets and Financial Instruments" means the following assets of Seller (i) cash, cash on hand, and cash equivalents, including accounts at any bank or financial institution, (ii) securities (whether capital stock or debt) of or held by Seller, (iii) retainers paid by Seller for legal, accounting or other professional services, and (iv) any letters of credit or similar financial accommodations issued to any third party(ies) for the account of Seller, but excluding any Business Prepaid Items.

"Material Adverse Effect" means any result, occurrence, fact, change, event or effect (whether or not constituting a breach of a representation, warranty or covenant set forth in this Agreement) that, individually or in the aggregate with any such other results, occurrences, facts, changes, events or effects, (i) would have or could reasonably be expected to have an adverse effect of $1,000,000 or more on the historical or near-term or long-term projected business, operations, prospects, assets, liabilities, condition (financial or otherwise) or results of operations (including EBITDA or cash flow), in each case, of Seller, or (ii) would or could reasonably be expected to prevent or materially impair or delay the ability of any of Seller to consummate the transactions contemplated by this Agreement or perform their duties under this Agreement or the other Transaction Documents.

"Permits" means any permits, licenses, franchises, approvals, certificates, certifications, consents, waivers, concessions, registrations or other authorizations of any Government Entity.

"Person" means an individual, partnership, corporation, limited liability company, limited liability partnership, business trust, joint stock company, trust, unincorporated association, joint venture, Government Entity, governmental unit or other entity of whatever nature.

"Personal Property Leases" means any equipment, personal property or intangible property leases, subleases, rental agreements, licenses, contracts and similar arrangements, except to the extent included in the Excluded Assets.

"Petition Date" means December 8, 2009, the date on which Seller filed its petition for relief under Chapter 11 of the Bankruptcy Code.

"Release" means any release, spill, emission, leaking, pumping, pouring, injection, escaping, deposit, disposal, discharge, dispersal, dumping, leaching or migration of any Hazardous Material into the indoor or outdoor environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Material), including the movement of any Hazardous Material through the air, soil, surface water or groundwater.

"Representatives" of any Person means that Person's directors, officers, managers, independent public accountants, counsel, consultants and other representatives.

"Retained Contracts" means any Contracts that are not Section 365 Contracts assumed by Purchaser.

"Retained Rights of Action" means all Rights of Action other than the Acquired Rights of Action.

"Rights of Action" means all actions that a trustee or debtor-in-possession is empowered to bring pursuant to the Bankruptcy Code, including without limitation, any cause of action, lawsuit, adversary proceeding, contested matter, claim objection, actions pursuant to Chapter 5 of the Bankruptcy Code, including, without limitation, actions pursuant to sections 542-553 of the Bankruptcy Code, or right against any person.

"Section 365 Contract" means the Leases and Contracts to be assumed and assigned to Purchaser at the Closing pursuant to Section 365 of the Bankruptcy Code or otherwise.

"Tangible Personal Property" means all furniture, fixtures, furnishings, equipment, machinery, motor vehicles, cranes, trailers, crawlers, all terrain hydraulics, other rolling stock, tools, computers, computer hardware, photocopiers, facsimile machines and other business equipment and devices (including data processing hardware and related telecommunications equipment, media, and tools), tools and tooling and miscellaneous items and other tangible personal property of Seller related to the Business; provided, however, that Tangible Personal Property shall not include Excluded Assets, Inventory or any tangible property held by Seller subject to a Personal Property Lease or other Contract unless such Personal Property Lease or other Contract is a Section 365 Contract assumed by Purchaser.

"Tax" and "Taxes" means all taxes, charges, fees, levies, penalties or other assessments imposed by any federal, state, local or foreign governmental authority, including income, gross receipts, excise, property, sales, use, license, custom duty, minimum estimated, profit, gift, severance, value added, disability, premium, recapture, credit, occupation, service, leasing, employment, stamp and other taxes, any amounts attributable to any failure to comply with any requirement regarding Tax Returns and any transferee or secondary Liability in respect of Taxes, including, in any case, any interest, penalty or addition thereto, whether disputed or not.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any schedule, attachment or other related or supporting

information) filed or required to be filed with any Government Entity in connection with the determination, assessment or collection of any Tax (whether or not such Tax is imposed on Seller) or the administration of any Laws, regulations or administrative requirements relating to any Tax, including any such document prepared on a consolidated, combined or unitary basis and including any amendment of a Tax Return.

"Transaction Documents" means this Agreement, as amended, including any schedules or exhibits hereto and any agreements, instruments, certificates or other documents executed and delivered in connection herewith.

"Transfer Tax" means any sales, purchase, transfer, stamp, stamp duty, documentary stamp, use, value added, or similar Tax under applicable state Laws which may be payable by reason of the purchase and sale of assets.

"Unsecured Creditor Carve Out" means cash in the amount of $200,000 which is to be funded on the Closing Date by, and in amounts agreed by and between, Bank Midwest, N.A., SL Financial Services Corporation and Wells Fargo Equipment Finance, Inc., as contemplated by the Plan of Liquidation.

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act of 1988, as amended, or any similar foreign, state or local Law, regulation or ordinance.

8.1     Terms Defined Elsewhere in this Agreement.  For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
| --- | --- |
| Agreement | Introduction |
| Allocation Statement | 2.6 |
| Acquired Rights of Action | 1.1.6 |
| Assignment and Assumption Agreement | 3.3.3 |
| Assignment of Intangible Property | 3.3.5 |
| Audited Financial Statements | 5.8 |
| Bankruptcy Code | Recital A |
| Bankruptcy Court | Recital A |
| Bill of Sale | 3.3.4 |
| Broward Courts | 9.11.2 |
| Business Contracts | 1.1.4 |
| Case | Recital A |
| Closing | 3.1 |
| Closing Date | 3.2.1 |
| Confirmation Order | Recital F |
| COBRA | 5.10.2 |
| Deposit | 2.2 |
| Disclosure Schedules | 5 |
| Employment Agreements | 4.1.7 |
| Environmental Permits | 5.15.5 |

| | |
|---|---|
| Excluded Liabilities | 2.5 |
| Execution Date | Introduction |
| Leases | 1.1.4 |
| Leases and Contracts | 1.1.4 |
| Master Loan and Security Agreements | 3.4.4 |
| Material Contracts | 5.13.1 |
| Patents | 8 (Definition of Intellectual Property) |
| Petition Date | Recital A |
| Plan of Liquidation | Recital C |
| Purchase Price | 2.1 |
| Purchaser | Introduction |
| Purchaser Employee Benefit Plans | 3.5.10 |
| Receivables | 1.1.5 |
| Saleable Assets | 1.1 |
| Seller | Introduction |
| Seller Financial Statements | 5.8.1 |
| Seller's Facility | 7.11 |
| Straddle Period | 3.6.2 |
| Straddle Period Taxes | 3.6.2 |
| Trade Secrets | 8 (Definition of Intellectual Property) |
| Trademarks | 8 (Definition of Intellectual Property) |
| Transferred Employee | 3.5.2 |

9. <u>Miscellaneous</u>.

9.1    <u>Expenses</u>.  Except as otherwise provided herein, Seller and Purchaser shall bear their own expenses in connection with the negotiation and execution of the Transaction Documents and the consummation of the Contemplated Transactions.

9.2    <u>Liability of Seller's Agents</u>.  No past, present or future officer, director, employee, member, manager, Affiliate, agent or attorney of Seller will have any Liability by reason of the breach of any term, provision or representation set forth in this Agreement, with Purchaser's recourse, if any, under such circumstances being limited to the assets of the Estate; provided, however, that the provisions of this <u>Section 9.2</u> shall not apply in the case of fraud or willful misconduct of such party.

9.3    <u>Attorneys' Fees</u>.  In the event that either party hereto brings an action or other proceeding to enforce or interpret the terms and provisions of this Agreement, the prevailing party in that action or proceeding shall be entitled to have and recover from the non-prevailing party all such fees, costs and expenses (including, without limitation, all court costs and reasonable attorneys' fees through all levels of appeal) as the prevailing party may suffer or incur in the pursuit or defense of such action or proceeding.

9.4    <u>Notices</u>.    All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if (i) delivered personally, (ii) mailed by first-class, registered or certified mail, return receipt requested, postage prepaid, (iii) sent by reputable next-

day or overnight mail or courier or (iv) sent by facsimile transmission.  All such notices, requests, demands, waivers and other communication shall be deemed to have been received (A) if by personal delivery, upon delivery, (B) if by certified or registered mail, on the third (3rd) Business Day after the mailing thereof, (C) if by next-day or overnight mail or courier, on the Business Day after such mailing, (D) if by facsimile, three (3) hours after the sender receives a fax confirmation, unless the facsimile is sent after 5:00 p.m. on a Business Day or on a non-Business Day, in which case it shall be deemed received on the next Business Day.

<div style="margin-left:2em">

If to Seller:        Gulfstream Crane, LLC  
                     1360 Northwest 33rd Street  
                     Pompano Beach, Florida 33064

With a copy (which shall not constitute notice) to:

                     Hinshaw & Culbertson LLP  
                     One East Broward Blvd., Suite 1010  
                     Ft. Lauderdale, Florida 33301  
                     Fax: (305) 577-1063  
                     Attn:  Michael D. Seese  
                           Eliot C. Abbott

If to Purchaser:    Allegiance Crane & Equipment, LLC  
                     c/o Prophet Equity, LP  
                     1460 Main Street, Suite 200  
                     Southlake, TX 76092  
                     Fax: (817) 898-1509  
                     Attention: Pelham Smith

With a copy (which shall not constitute notice) to:

                     Haynes and Boone, LLP  
                     2323 Victory Avenue, Suite 700  
                     Dallas, Texas 75219  
                     Fax:  (214) 200-0788  
                     Attention:  Dennis R. Cassell

</div>

or in each case, to such other address as may be specified in writing to the other parties.

Any party may give any notice, instruction or communication in connection with this Agreement using any other means (including personal delivery, telecopy or ordinary mail), but no such notice, instruction or communication shall be deemed to have been delivered unless and until it is actually received by the party to whom it was sent.  Any party may change the address to which notices, instructions, or communications are to be delivered by giving the other parties to this Agreement notice thereof in the manner set forth in this Section 9.4.

9.5    _Entire Agreement_.  The Transaction Documents (including any schedules or exhibits thereto) contain the entire understanding and agreement between the parties with respect to the subject matter hereof.

9.6    _Amendment_.    This Agreement may be amended, modified or supplemented only by a written instrument duly executed by all the parties hereto and, where required, the Bankruptcy Court.

9.7    _Assignments_.  This Agreement shall not be assigned by either party hereto without the prior written consent of the other party hereto; provided, that Purchaser shall be permitted to assign its right to purchase all or any portion of the Saleable Assets to any one or more Affiliates of Purchaser and provided further that any such assignment(s) shall in no way release or relieve Purchaser from any Liability under this Agreement.

9.8    _Binding Effect_.  Subject to any restrictions hereunder on the assignment of this Agreement, this Agreement shall bind and inure to the benefit of the respective heirs, personal representatives, successors and assigns of the parties.

9.9    _Severability_.  Any term or provision of this Agreement that is invalid or unenforceable shall be ineffective to the extent of such invalidity or unenforceability, without rendering invalid or unenforceable or affecting the validity or enforceability of any of the other terms or provisions of this Agreement.  Any term or provision of this Agreement that is invalid or unenforceable in any jurisdiction shall be ineffective in such jurisdiction, without rendering invalid or unenforceable or effecting the validity or enforceability of any terms or provisions of this Agreement in any other jurisdiction.

9.10    _Waiver_.  No action taken pursuant to this Agreement, including any investigation by or on behalf of any party, shall be deemed to constitute a waiver by any party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

9.11    _Consent to Jurisdiction_.

9.11.1    Until the entry of an order either closing or dismissing the Case, each party hereto hereby (i) irrevocably elects as the sole judicial forum for the adjudication of any matter arising under or in connection with this Agreement or any other Transaction Document, and consents to the exclusive jurisdiction of, the Bankruptcy Court, (ii) expressly waives any defense or objection to jurisdiction or venue based on the doctrine of _forum non conveniens_, and (iii) stipulates that the Bankruptcy Court shall have _in personam_ jurisdiction over such party.

9.11.2    After the entry of an order either closing or dismissing the Case, each party hereto hereby irrevocably submits to the exclusive jurisdiction of the state and federal

courts in Broward County, Florida (the *"Broward Courts"*) in any action arising out of or relating to this Agreement or any other Transaction Document, and each such party hereto hereby irrevocably agrees that all claims in respect of any such action shall be heard and determined in Broward Courts. Each party hereto, to the extent permitted by applicable Law, hereby expressly waives any defense or objection to jurisdiction or venue based on the doctrine of *forum non conveniens*, and stipulates that the Broward Courts shall have *in personam* jurisdiction and venue over such party for the purpose of litigating any dispute or controversy between the parties arising out of or relating to this Agreement or any other Transaction Document. In the event that either party hereto shall commence or maintain any action arising out of or relating to this Agreement or any other Transaction Document in a forum other than Broward Courts, the other party hereto shall be entitled to request the dismissal or stay of such action, and each party hereto stipulates for itself that such action shall be dismissed or stayed. To the extent that either party hereto has or hereafter may acquire any immunity from the jurisdiction of Broward Courts or from any legal process (whether through service or notice, attachment prior to judgment, attachment in aid of execution or otherwise) with respect to itself or its property, each such party hereby irrevocably waives such immunity.

      9.12   <u>Conflicts with Plan of Liquidation/Confirmation Order</u>. In the event of a conflict between the terms of this Agreement and the terms of the Plan of Liquidation, as amended, and/or the Confirmation Order, the terms of this Agreement shall govern, unless such conflict is agreed to in writing as an amendment to this Agreement and signed by Purchaser.

      9.13   <u>Interpretation</u>. Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

      9.13.1   This Agreement and the other Transaction Documents shall be governed by and construed in accordance with the laws of the State of Florida without regard to the rules of conflict of laws of such state, except to the extent that the Bankruptcy Code is applicable.

      9.13.2   This Agreement shall not be deemed to have been drafted by either party hereto but rather drafted as the result of extensive negotiations between the parties.

      9.13.3   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded. If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

      9.13.4   Any reference in this Agreement to $ shall mean U.S. dollars.

      9.13.5   The exhibits and schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All exhibits and schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any schedule or exhibit but not otherwise defined herein shall be defined as set forth in this Agreement.

      9.13.6   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

9.13.7  The provision of a table of contents, the division of this Agreement into articles, sections or other subdivisions, and the insertion of captions, titles or headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement.   All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

9.13.8  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

9.13.9  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

9.14  Counterparts.  This Agreement may be executed by facsimile signature and in any number of counterparts, each of which shall be deemed an original and all which together shall constitute one and the same instrument.

9.15  Time is of the Essence.  Time is of the essence in this Agreement, and all of the terms, covenants and conditions hereof.

9.16  Third Party Beneficiaries.  This Agreement is not intended to create any third party beneficiaries.

9.17  Tax Effect.  None of the parties (nor such parties' counsel or accountants) has made or is making in this Agreement or any of the Transaction Documents any representation to any other party (or such party's counsel or accountants) concerning any of the Tax effects or consequences on the other party of the transactions provided for in this Agreement.  Each party represents that it has obtained, or may obtain, independent Tax advice with respect thereto and upon which it, if so obtained, has solely relied.

9.18  Investigation.  No knowledge or information provided to or obtained by Purchaser (or capable of being obtained by Purchaser) in connection with its investigation of Seller or the Business shall limit or otherwise affect the remedies available hereunder to Purchaser, or the representations or warranties of, or the conditions to the obligations of, the parties hereto.

9.19  Limitation of Representations and Warranties.  The representations and warranties made by Seller and Purchaser in this Agreement shall terminate on the Closing Date, immediately following the Closing.

**IN WITNESS WHEREOF**, Purchaser and Seller have executed this Agreement as of the day and year first above written.

<div align="right">

**PURCHASER**:

**Allegiance Crane & Equipment, LLC,**
a Delaware limited liability company

By: _____
Name:_____
Its:_____


**SELLER:**

**Gulfstream Crane, LLC,**
a Florida limited liability company,
Debtor and Debtor in Possession

By: _____
Name:_____
Its:_____

</div>

## SCHEDULES AND EXHIBITS

[TBD]